# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01085-COA

| | |
|---|---|
| DONNA WALDRUP, INDIVIDUALLY, AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF MARY LINDSEY, DECEASED | APPELLANT / CROSS-APPELLEE |

v.

| | |
|---|---|
| STEPHANIE EADS, APRN, BC | APPELLEE / CROSS-APPELLANT |

DATE OF JUDGMENT: 07/01/2014
TRIAL JUDGE: HON. JOSEPH H. LOPER JR.
COURT FROM WHICH APPEALED: GRENADA COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: BRIAN AUSTIN HINTON
AMANDA LEIGH MYERS
ATTORNEYS FOR APPELLEE: S. MARK WANN
KELLY HOLLINGSWORTH STRINGER
NATURE OF THE CASE: CIVIL - MEDICAL MALPRACTICE
TRIAL COURT DISPOSITION: GRANTED SUMMARY JUDGMENT IN FAVOR OF APPELLEE AND SANCTIONED APPELLANT AND HER COUNSEL $12,000 FOR VIOLATING THE MISSISSIPPI LITIGATION ACCOUNTABILITY ACT
DISPOSITION: AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 12/01/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., MAXWELL AND FAIR, JJ.**

**MAXWELL, J., FOR THE COURT:**

¶1.     A medical-malpractice claim must be "filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first

known or discovered[.]"[1] Donna Waldrup filed her wrongful-death claim based on Stephanie Eads's medical negligence more than two years after Waldrup's mother died. Waldrup claimed the four-month delay in her mother's official autopsy report tolled the two-year statute of limitations, making her claim timely. But the undisputed evidence shows Waldrup and her siblings suspected Eads had committed medical negligence the day their mother died. And the autopsy report revealed nothing about Eads's involvement in their mother's care they had not already known. So the statute of limitations was not tolled by the pending autopsy report.

¶2. Because the two-year limitations period had run by the time Waldrup filed her complaint, we affirm the dismissal of this claim on summary judgment.

¶3. But we do not affirm the award of sanctions based on Waldrup's untimely filing. While Waldup's claim was ultimately unsuccessful, it cannot be said to have had "no hope of success."[2] We thus reverse the award of sanctions and render a judgment in Waldrup's favor on that issue.

**Facts and Procedural History**

### I. Mary Lindsey's Death

¶4. When Lindsey died, she was a sixty-four-year-old patient at Grace Health and Rehab

---

[1] Miss. Code Ann. § 15-1-36(2) (Rev. 2012).

[2] *Miller v. Provident Advert. & Mktg., Inc.*, 155 So. 3d 181, 196 (¶44) (Miss. Ct. App. 2014) (quoting *Stevens v. Lake*, 615 So. 2d 1177, 1184 (Miss. 1993)) (defining a "frivolous" claim as one in which, "*objectively* speaking, the pleader or movant had no hope of success").

of Grenada. She suffered from a condition that had left her paralyzed from the waist down. She complained of constant pain and also struggled with constipation. According to her daughter, Waldrup, an x-ray earlier that year had shown Lindsey "was full of poop." Her son Tracey Smith also testified Lindsey's stomach was noticeably swollen. Apparently, Lindsey had been hospitalized at least once earlier in the year.

¶5. Waldrup lived in Grenada and was primarily responsible for her mother's care. In the months leading up to Lindsey's death, Waldrup expressed dissatisfaction with the care Grace provided. She also looked into moving Lindsey to a nursing home in Carthage, where Tracey lived.

¶6. But before Waldrup could move her mother, on November 6, 2010, Lindsey began to ask for an ambulance to take her to the hospital. But Grace did not take her. Lindsey called Waldrup crying, saying she wanted to go to the hospital. Lindsey threw up in the middle of the night. And late the next morning, November 7, 2010, she died.

¶7. The deputy coroner was called to the nursing home. The nurse on duty's notes showed the coroner told her no autopsy would be performed because the county would not pay for one in this situation. So the coroner left. But when Waldrup and other family members arrived at Grace, the coroner returned. The family asked to speak with him outside the presence of Grace administrators and staff. The family told the coroner Lindsey's death was "mysterious" and insisted an autopsy should be performed. While the coroner later testified the decision to perform an autopsy was his alone, to satisfy himself of the cause of

3

death, he put on the autopsy-request form "[t]he family of deceased are troubled about the care that was given to [the] deceased."

¶8.  The autopsy was performed six days later, on November 13, 2010.  But the final autopsy report was not signed until March 17, 2011.  The medical examiner determined the cause of death was septic peritonitis, or "sepsis."  Apparently, Lindsey's colon had perforated and fecal matter had seeped into her gut, causing the deadly infection.

## II.  Waldrup's Wrongful-Death Suit

¶9.  The statute of limitations for a wrongful-death suit is governed by the underlying legal theory, in this case medical malpractice.  The statute of limitations for medical malpractice is two years.  Miss. Code Ann. § 15-1-36(2) (Rev. 2012).  But no action "may be begun unless the defendant has been given at least sixty (60) days' prior written notice of the intention to begin the action."  Miss Code Ann. § 15-1-36(15).

¶10.  On October 7, 2012, a year and eleven months after Lindsey's death, Waldrup, as representative of Lindsey's wrongful-death beneficiaries, sent the mandatory notice-of-suit letter to Dr. Joseph Roberts—the physician primarily responsible for Lindsey's care at Grace.  By statute, this notice tolled the running of the statute of limitations for sixty days.  Miss. Code Ann. § 15-1-36(15) ("If the notice is served within sixty (60) days prior to the expiration of the applicable statute of limitations, the time for the commencement of the action shall be extended sixty (60) days from the service of the notice for said health care providers and others.").  And on December 7, 2012, Waldrup filed a wrongful-death suit

4

against Dr. Roberts.

¶11. Five days later, on December 12, 2012, Waldrup sent a notice-of-suit letter to Eads—the nurse practitioner responsible for Lindsey's care. The same day, Waldrup amended her complaint against Dr. Roberts to add Eads as a defendant. (Waldrup later testified she had always intended to name Eads as a defendant, along with Dr. Roberts. And the fact Eads was not given notice in October 2012 and named in the complaint filed on December 7, 2012, was an oversight or mistake.)

¶12. In response, Eads's attorney sent Waldrup's counsel a letter on January 15, 2013. This letter informed Waldrup's counsel that the two-year statute of limitations had started to run against Eads on November 7, 2010—the day Lindsey died. And because Waldrup had failed to send the mandatory sixty-day presuit notice before the statute of limitations expired, Waldrup's complaint against Eads was untimely.

¶13. Waldrup's counsel replied by arguing the earliest the limitations period began to run was March 17, 2011—the date the autopsy report was signed. So the statute had not yet run. Counsel's letter dated February 12, 2013, asserted, "As of today's date, we have filed suit against your client in Grenada Circuit Court." But this was incorrect, since the suit was filed two months earlier.

### III. Motion to Dismiss

¶14. Eads waived service of process in late March 2013. She then responded to the complaint with a motion to dismiss. This motion urged the complaint was filed outside the

5

two-year statute of limitations and had to be dismissed. Alternatively, the complaint must—at a minimum—be dismissed without prejudice for failure to comply with the sixty-day presuit-notice requirement of section 15-1-36(15).

¶15. While this motion was being briefed and argued before the circuit court, both sides submitted evidence outside the pleadings. And the circuit court ruled the motion to dismiss had thus converted into a motion for summary judgment. Waldrup's counsel suggested that discovery was necessary to determine when the family reasonably discovered medical negligence had occurred. Because the circuit court found, from the face of the complaint, that it could not be dismissed on the statute-of-limitations issue, the court denied the motion to dismiss and allowed Waldrup to proceed with discovery.

### IV. Motion for Summary Judgment

¶16. Six and a half months later, in October 2013, Eads renewed her motion to dismiss and, alternatively, filed for summary judgment. She also filed a motion for attorney's fees and expenses under the Mississippi Litigation Accountability Act (MLAA). Miss. Code Ann. § 11-55-5(1) (Rev. 2012). This time, the circuit court granted her motion.

#### A. Statute of Limitations

¶17. In the court's opinion, "Lindsey's family knew or should have known with reasonable diligence of the neglect at the time of Lindsey's death." So under section 15-1-36(2), the statute of limitations ran on November 7, 2012, two years after Lindsey's death.

¶18. The circuit court rejected Waldrup's argument that it was only after the autopsy results

6

were released that the family discovered Eads's neglect. The circuit court relied on evidence that Waldrup was already concerned *prior to Lindsey's death* that the nurses would not call for an ambulance to take Lindsey to the hospital. The circuit court also found no autopsy would have been ordered had the family not voiced its concerns. Lindsey's son Tracey, in his deposition, testified to the coroner's reluctance to order an autopsy. But the family insisted Lindsey "wasn't supposed to die" and something was wrong with her death.

¶19. Tracey also testified about how the family was already unsatisfied with Grace's care and had considered transferring Lindsey to another home. Significantly, Tracey revealed that his family started talking about filing a lawsuit against Eads within a few weeks after Lindsey died. Lindsey's other son, Guy Smith, confirmed in his deposition that the family had wanted to move Lindsey out of Grace before she died because the nurses were not taking care of her. Guy also maintained the family was criticizing Eads's supposed lack of care within days of Lindsey's death.

¶20. Relying on *Sutherland v. Estate of Ritter*, 959 So. 2d 1004, 1009 (¶15) (Miss. 2007), the circuit court determined there was enough suspicion of negligent care for Lindsey's family to have discovered the alleged negligence by the time of her death. Before her death, the family already thought Lindsey was being neglected. They also knew she suffered from constipation. The morning of her death, they also knew Lindsey had been denied her request to go to the hospital. Further, the autopsy did not *lead* to their suspecting negligence—it was actually the *result* of their suspicions. And according to the circuit judge, "nothing in the

7

autopsy report provided information that Stephanie Eads should be a named party that was not known by Lindsey's family prior to or immediately following Lindsey's death."

¶21. Thus, the circuit court granted summary judgment in Eads's favor on the statute of limitations running.

### B. Statutory Notice Requirement

¶22. Alternatively, the circuit court found dismissal without prejudice would be appropriate. Indisputably, Waldrup failed to comply with section 15-1-36(15)'s sixty-day presuit-notice requirement because she began her lawsuit against Eads the very same day she gave notice.

### C. Litigation Accountability Act

¶23. Finally, the circuit court granted Eads's motion for attorney's fees and costs. Eads pointed to the fact Waldrup relied on the autopsy to toll the running of the statute of limitations. But nothing in the report supported her discovery-rule argument. Instead, what the depositions showed is that Waldrup planned to sue Eads months before the report was signed.

¶24. Section 11-55-5(1) allows courts to award attorney's fees as sanctions where an action is filed "without substantial justification"—"mean[ing] that it is frivolous, groundless in fact or in law." Miss. Code Ann. § 11-55-3(a) (Rev. 2012). The court found Waldrup's action against Eads was frivolous because it was filed after the statute of limitations had expired. Further, Waldrup was notified by Eads's attorney as early as January 15, 2013, about this

8

issue and the fact Eads would pursue sanctions if the complaint was not dropped. Because Waldrup persisted in her complaint against Eads, the circuit court sanctioned her and her attorney. The judge awarded Eads "all attorney fees and litigation costs that she incurred from and after January 15, 2013."

¶25. According to the bills submitted to the circuit court, Eads incurred $89,572.50 in attorney's fees and $17,276.84 in litigation expenses. The circuit court awarded only eleven percent of that amount, or $12,000, as sanctions.

## V. Appeal

¶26. The circuit court certified its dismissal of Eads and award of sanctions as a final judgment. Waldrup timely appealed the dismissal—both with prejudice for failure to file within the statute of limitations and without prejudice for not giving proper presuit notice. She also appealed the sanctions award.

¶27. Eads cross-appealed the amount of sanctions, claiming the circuit court arbitrarily slashed the amount of attorney's fees and expenses. In addition to asking for the full amount of her lower-court bills—$106,849.34—she asks this court to further sanction Waldrup on appeal and award additional attorney's fees.

## Discussion

¶28. Under Mississippi law, Waldrup's suit against Eads had to be dismissed. But the question we must decide is whether the circuit judge should have dismissed it *with or without prejudice*.

¶29. Waldrup filed her presuit notice the same day she filed her suit.[3] So even if Waldrup's complaint was timely, it was obviously not preceded by the mandatory sixty days' presuit notice. *See* Miss. Code Ann. § 15-1-36(15). The Mississippi Supreme Court "requires strict compliance with Section 15-1-36(15)." *Fowler v. White*, 85 So. 3d 287, 291 (¶13) (Miss. 2012). Thus, at a minimum, Waldrup's "failure to satisfy the presuit-notice requirement mandates dismissal without prejudice." *Id.* (emphasis added).

¶30. The circuit judge, however, found Waldrup's complaint against Eads was not timely. We review the circuit court's grant of summary judgment based on the statute of limitations de novo. *Sutherland*, 959 So. 2d at 1007 (¶8). And our de novo review leads us to the same conclusion—the two-year window to file a medical-malpractice suit began November 7, 2010, and was not tolled by section 15-1-36(2)'s discovery rule. Thus, we affirm the dismissal of Waldrup's claims against Eads with prejudice.

## I.    Statute of Limitations for Medical Malpractice

¶31. While most negligence-based claims enjoy a three-year statute of limitations, actions for medical negligence have a shorter limitations period of two years. Miss. Code Ann. § 15-

---

[3] In a attempt to avoid dismissal, Waldrup tries to argue she did in fact comply with the presuit-notice requirement because the lawsuit against Eads did not actually "begin" until Waldrup served Eads with process more than sixty days later. As support, Waldrup cites Mississippi Rule of Civil Procedure 4, which governs service of process. But "[i]n the Twenty-First Century, the commencement of a lawsuit is governed by Mississippi Rule of Civil Procedure 3(a), which states that a civil action is commenced by filing a complaint with the court." *Arceo v. Tolliver*, 19 So. 3d 67, 74 (¶32) (Miss. 2009). So under Rule 3(a), Waldrup's lawsuit against Eads began December 12, 2012—the same day she sent Eads notice.

1-36(2). But the statute has a built-in discovery rule: The two-year period begins "from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered." *Id.*

¶32.     "Application of the discovery rule is a fact-intensive process." *Huss v. Gayden*, 991 So. 2d 162, 166 (¶6) (Miss. 2008). For this reason, there are no clear categories for when the discovery rule tolls the statute of limitations and when it does not. Take, for example, medical records. In one case, the supreme court held it was not reasonable for a wife to discover medical negligence until she received her husband's medical records months after his death. *Sarris v. Smith*, 782 So. 2d 721, 724 (¶11) (Miss. 2001). But in another, the court held the patient knew there had been acts of medical negligence *before* her medical records were obtained, so the statute was not tolled. *Gray v. Univ. of Miss. Sch. of Med.*, 996 So. 2d 75, 80 (¶15) (Miss. 2008). Another example is expert medical opinions. In one case the court held that, while the patient and her husband knew of her injuries, they could not have reasonably known the hospital was negligent until a medical expert told them a year later. So the statute was tolled. *Barnes v. Singing Riv. Hosp. Sys.*, 733 So. 2d 199, 206 (¶20) (Miss. 1999). But the court held in another case that the mother of a baby who died in utero had enough information to suspect negligence before she even left the hospital. So having an expert give his opinion *two years later* that her doctor's negligence led to her baby's death did not toll the running of the statute of limitations. *Jackson Clinic for Women, P.A. v. Henley*, 965 So. 2d 643, 650 (¶¶14-15) (Miss. 2007).

¶33. While these cases had differing outcomes, they each had the same focus—when should the plaintiff, exercising reasonable diligence, have first discovered the negligence, rather than the injury. *Gray*, 996 So. 2d at 80 (¶15) ("The facts of this case do not sufficiently demonstrate that Gray learned of the negligence after receiving the medical records and obtaining an expert opinion."); *Henley*, 965 So. 2d at 650 (¶15) ("Moore knew that negligent conduct might have occurred . . . while still in the hospital, shortly after her surgery[.]"); *Sarris*, 782 So. 2d at 723 (¶8) ("The resolution of this issue . . . turns on when Sarris 'discovered the wrongful conduct within the meaning of the statute.'"); *Barnes*, 733 So. 2d at 206 (¶20) ("While the Barneses may have been aware of Lisa's injuries before the one year time limit was up, they could not reasonably have known that Singing River was responsible for those injuries until their medical expert notified them of the possible negligence[.]"). This is because section 15-1-36(2)'s discovery rule is different than the latent-injury provision in the general statute of limitations. *Sutherland*, 959 So. 2d at 1008-09 (¶¶11-12) (comparing Miss. Code Ann. § 15-1-36(2) with Miss. Code Ann. § 15-1-49(2) (Rev. 2012)). In medical-malpractice actions, "[t]he inquiry does not center on a latent injury, but rather on 'the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.'" *Id.* at 1008 (¶12) (quoting Miss. Code Ann. § 15-1-36(2)). "Thus, in medical negligence cases, we must focus our inquiry on when a plaintiff, exercising reasonable diligence, *should have first discovered the negligence*, rather than the injury." *Id.* (emphasis added); *see also Holaday v. Moore*, 169 So. 3d 847,

12

851 (¶12) (Miss. 2015) (finding a genuine issue of material fact whether the plaintiff did not discover a second doctor's negligent involvement in his care until four years after he had sued the first doctor for his injuries).

¶34. Waldrup would have us focus on when she and her family received the official autopsy report on how Lindsey died, which was four months after Lindsey's death. But as mentioned above, the statute is not automatically tolled while waiting on an autopsy report, medical records, or expert opinion. *See Gray*, 996 So. 2d at 80 (¶15); *Henley*, 965 So. 2d at 650 (¶¶14-15). Instead, we must focus on whether the date of the autopsy report was the first time Waldrup, having exercised reasonable diligence, should have discovered Eads had been medically negligent. *See Sutherland*, 959 So. 2d at 1008 (¶12).

¶35. Waldrup asserts she could not have reasonably discovered Eads's alleged medical negligence until she learned in March 2011 her mother's official cause of death. But this assertion is not supported by the evidence. What the evidence shows is that even before their mother's death, she and her siblings were dissatisfied with the nursing care provided at Grace. Hours before Lindsey died, she called Waldrup crying because the nurses would not send her to the hospital. As soon as Lindsey died, Waldrup and other family members demanded answers and an autopsy. And months before the autopsy report was officially signed, they were already talking about suing Eads. Moreover, Waldrup sued Lindsey's doctor within two years of her death and admitted that it was an oversight not to sue Eads at the same time. These facts indisputably show that, by the time of Lindsey's death, Waldrup's

13

"suspicions and actions thereon . . . were enough to satisfy the statutory requirement of discovery of the alleged medical negligence on the part of [Eads]." *Sutherland*, 959 So. 2d at 1009 (¶15); *see also Wayne Gen. Hosp. v. Hayes*, 868 So. 2d 997, 1001 (¶17) (Miss. 2004) (finding "at [the] time of [their daughter's] death, [the parents] had enough information such that they knew or reasonably should have known that some negligent conduct had occurred, even it they did not know with certainty that the conduct was negligent as a matter of law").

¶36.  Like the circuit court, we find this case is factually similar to *Sutherland*.  There, though Sutherland had experienced severe negative side affects from a drug he was prescribed, he was not diagnosed with a permanent condition until a year later. *Sutherland*, 959 So. 2d at 1005-06 (¶¶2-4).  He filed a medical-negligence suit against his prescribing physician two years after his diagnosis, which the supreme court found untimely. *Id.* at 1006 (¶5), 1009-10 (¶17).  Focusing on when Sutherland "should have first discovered the negligence, rather than the injury," the supreme court found Sutherland's own immediate suspicions and pre-diagnosis actions to combat the drug's effects were enough to trigger the two-year statute of limitations. *Id.* at 1008-09 (¶¶12-16).  So Sutherland could not rely on the later diagnosis to toll the statute of limitations.

¶37.  Turning to our case, we find Waldrup similarly could not rely on the later autopsy report to keep the two-year limitations period from beginning.  Like Sutherland, whose diagnosis confirmed his suspicions that the drug had been harmful, Lindsey's autopsy report confirmed Waldrup's suspicions that Eads's negligence played a part in her mother's death.

14

Yet it did not reveal any act, omission, or neglect by Eads that would not have been otherwise known or suspected.

¶38.   This case is also similar to *Henley*.  There, a women who was thirty-four weeks pregnant went to her obstetrician complaining of abdominal pain.  The doctor sent her home with a Tylenol.  She returned with even more severe pain.  *Henley*, 965 So. 2d at 644 (¶2).  She was hospitalized.  The next morning, a sonogram revealed the baby had died in the womb.  The obstetrician performed a C-section.  While in surgery, the doctor had to remove most of her small intestine, which had twisted.  Apparently, it was this twisted intestine that had cut off the blood supply to her womb, killing her baby.  *Id.* at (¶3).  Two and a half years later, the mother went to Mayo Clinic due to her ongoing bowel problems.  While there, the mother claimed she "was alerted to the fact that [her] treatment [two and a half years earlier] may have been the cause of the death of [her] baby and of [her] short bowel syndrome." *Id.* at 646 (¶8).

¶39.   Seven months after leaving Mayo Clinic (three years after the C-section and intestinal surgery), the mother sued her obstetrician for the wrongful death of her baby.  *Id.* at 647 (¶9).  The supreme court held the mother's suit was untimely.  *Id.* at 650 (¶15).  The mother had "believed that some type of negligence had occurred while she was in the hospital," telling her sister, a psychiatrist, "something was wrong.  Something was real wrong.'" *Id.*  She "then proceeded to hire an attorney, obtain her medical records, and make an outline of all of the acts that she deemed negligent"—all before she went to Mayo Clinic.  *Id.*  Thus, her

15

"own suspicions regarding possible negligent conduct start[ed] the clock running" when she left the hospital after her baby's death and surgery. *Id.*

¶40. Waldrup tries to distinguish herself from the mother in *Henley*, making much of the fact that neither she nor anyone else in her family is a nurse or doctor. So their education and training would not lead them to suspect anything was wrong with their mother's care. But despite no medical background, Lindsey's family undisputedly knew something was wrong the day Lindsey died. They knew Lindsey's request to go to the hospital was refused. And even a layman would suspect negligence if someone begged for an ambulance, was refused one, and died hours later. *See Wright v. Quesnel*, 876 So. 2d 362, 367 (¶14) (Miss. 2004) (finding the mother of a baby that died in the womb "had enough information at the time of death" to know negligence occurred because she had been to her doctor twice but received no treatment). Here, just as in *Henley*, Lindsey's family told the coroner right after her death that Lindsey's death was "mysterious," that they were troubled about the medical care provided to Lindsey, and that an autopsy had to be performed. We find these suspicions started the two-year clock to file suit on November 7, 2010. *See id.* So the statute of limitations had run by the time she simultaneously filed her presuit notice and lawsuit on December 12, 2012.

¶41. In affirming the grant of summary judgment based on the running of the statute of limitations, we are mindful the "[a]pplication of the discovery rule is a fact-intensive process." *Huss*, 991 So. 2d at 166 (¶6). And "when a valid factual dispute exists, the issue

16

[must] be settled by the finder of fact, a jury." *Id.*; *see, e.g., Holaday*, 169 So. 3d at 852 (¶16) (finding summary judgment was not appropriate because "a genuine issue of material fact remained on the question of whether Dr. Holaday treated Mr. Moore, or participated in his treatment"). But here there is no valid factual dispute. From their own testimony, Lindsey's family believed Eads's negligence played a part in her death before the autopsy report was signed. Moreover, an autopsy was performed based on their suspicions. So the autopsy report was not when their suspicions first began. Thus, the circuit judge correctly held the discovery rule did not toll the statute of limitations for the four months they were waiting on the report. *See Huss*, 991 So. 2d at 167 (¶9) ("[A]n individual may not take shelter in the 'discovery rule' when reasonable minds could not differ that the plaintiff possessed sufficient information to bring a claim.").

## II. Sanctions

¶42. That said, we do not find Waldrup's attempt to avoid dismissal by asserting the discovery rule was sanctionable under the MLAA. *See* Miss. Code Ann. § 11-55-5(1).

¶43. Under this section, if the court—on its own motion or the motion of any party—"finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct," then "the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs."

17

Miss. Code Ann. § 11-55-5(1). The award may be against the party or attorney or both. *Id.*

¶44. Here, the circuit court found Waldrup's untimely claim against Eads was "without substantial justification." Section 11-55-3 defines "without substantial justification" as "frivolous, groundless in fact or in law, or vexatious." Miss. Code Ann. § 11-55-3(a). The term "frivolous" in the MLAA has the same meaning as in the Civil Procedure Rule 11 and Appellate Rule 38 context. M.R.C.P. 11; M.R.A.P. 38; *Miller v. Provident Advert. & Mktg., Inc.*, 155 So. 3d 181, 196 (¶44) (Miss. Ct. App. 2014) (using same test for MLAA and Rule 11); *Pickett v. Gallagher*, 159 So. 3d 587, 592 (¶17) (Miss. Ct. App. 2014) (using same test for Rule 38 and Rule 11). "A claim is frivolous only when, *objectively* speaking, the pleader or movant had no hope of success." *Miller*, 155 So. 3d at 196 (¶44) (citation omitted).

¶45. In *Miller*, a Tennessee resident took advantage of Mississippi's long-arm statute to sue a Florida resident for alienation of affection—a cause of action not recognized in Tennessee. The circuit court dismissed the action for lack of personal jurisdiction. The court also awarded sanctions under the MLAA. This court reversed the dismissal. But then it went on to note that "even if we were to affirm dismissal of the case for lack of jurisdiction, we would nonetheless reverse and render the award of attorney's fees." *Miller*, 155 So. 3d at 196 (¶44). "The trial court concluded that the long-arm statute was satisfied in this case." *Id.* at (¶45). And "[i]t was only when conducting the 'fact intensive' inquiry as to the minimum contacts . . . that any problem arose." *Id.* So because dismissal followed after a fact-intensive inquiry, this court could not say the claim had no hope of success.

18

¶46. Translating *Miller*'s logic to this case, we find, because the "[a]pplication of the discovery rule is a fact-intensive process,"[4] Waldrup's discovery-rule argument, objectively speaking, was not frivolous. It was only after the fact-intensive inquiry at the summary-judgment stage that the circuit court concluded there was no genuine issue of material fact in applying the discovery rule. So we find it was an abuse of discretion to deem Waldrup's claim as having no hope of success. *See id.* at (¶44) (applying abuse-of-discretion standard to award of sanctions under MLAA). In *Pickett*, we affirmed the grant of summary judgment based on the running of the statute of limitations. But we refused to award sanctions because the plaintiff had "presented an arguable defense to the statute of limitations." *Pickett*, 159 So. 3d at 592 (¶18). In *Stevens*, the supreme court made a similar finding. "[D]espite the weakness of their arguments" as to why the statute of limitations had not run, the supreme court could not say the legal-malpractice claim "was *clearly* barred by the applicable statute of limitations." *Stevens*, 615 So. 2d at 1185.

¶47. Here, the application of the discovery rule was an arguable, albeit weak, defense to Eads's statute-of-limitations argument. And we find Waldrup's reliance on the discovery rule, though unsuccessful, is not sanctionable. We reverse the sanctions award and render a judgment in favor of Waldrup on this issue.

¶48. Consequently, we need not address Eads's argument on cross-appeal that the circuit court abused its discretion when setting the amount of the award at $12,000.

---

[4] *Huss*, 991 So. 2d at 166 (¶6).

19

¶49. **THE JUDGMENT OF THE GRENADA COUNTY CIRCUIT COURT IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ALL COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE APPELLANT / CROSS-APPELLEE AND THE APPELLEE / CROSS-APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, FAIR, JAMES AND WILSON, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**