# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-SA-02002-COA

**MISSISSIPPI DEPARTMENT OF AUDIT,**            **APPELLANTS**
**STACEY PICKERING, JIM HOOD, CHRIS**
**LOTT, DAVID HUGGINS, MELISSA C.**
**PATTERSON, JOSEPH A. RUNNELS, JR.,**
**SANDRA R. CHESNUT AND HAROLD E.**
**PIZZETTA, III**

**v.**

**GULF PUBLISHING COMPANY, INC.**            **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/04/2013 |
| TRIAL JUDGE: | HON. JENNIFER T. SCHLOEGEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MARGARET P. ELLIS |
| | ARTHUR F. JERNIGAN JR. |
| | JOHN G. CORLEW |
| | ROBERT V. GREENLEE |
| | ALAN M. PURDIE |
| | JOHN T. KITCHENS |
| | THOMAS EUGENE WHITFIELD JR. |
| | DION JEFFERY SHANLEY |
| | SAMUEL L. ANDERSON |
| | ROY M. TIPTON |
| | JUDY T. MARTIN |
| ATTORNEY FOR APPELLEE: | HENRY LAIRD |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED: 03/29/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2014-SA-00894-COA

**MELISSA C. PATTERSON, STACEY PICKERING, INDIVIDUALLY, DAVID HUGGINS, INDIVIDUALLY, CHRIS LOTT, INDIVIDUALLY, MISSISSIPPI DEPARTMENT OF AUDIT, STACEY PICKERING IN HIS OFFICIAL CAPACITY AS STATE AUDITOR FOR THE STATE OF MISSISSIPPI, HAROLD E. PIZZETTA, III, MISSISSIPPI DEPARTMENT OF MARINE RESOURCES, JOSEPH A. RUNNELS, JR., SANDRA R. CHESNUT AND JIM HOOD**

**APPELLANTS**

**v.**

**GULF PUBLISHING COMPANY, INC.**

**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/27/2014 |
| TRIAL JUDGE: | HON. JENNIFER T. SCHLOEGEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | MARGARET P. ELLIS |
| | ARTHUR F. JERNIGAN JR. |
| | JOHN G. CORLEW |
| | ROBERT V. GREENLEE |
| | ALAN M. PURDIE |
| | JOHN T. KITCHENS |
| | DION JEFFERY SHANLEY |
| | RONALD G. PERESICH |
| | WILLIAM V. WESTBROOK III |
| | SAMUEL L. ANDERSON |
| ATTORNEY FOR APPELLEE: | HENRY LAIRD |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED: 03/29/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

LEE, C.J., FOR THE COURT:

## FACTS AND PROCEDURAL HISTORY

I.      **Initial Lawsuit**

2

¶1.     In 2012, the Department of Marine Resources (DMR) was being investigated by a joint federal and state task force for misappropriation of funds. On November 14, 2012, the *Sun Herald* newspaper submitted a written request to obtain DMR records, in accordance with section 25-61-5 of the Mississippi Public Records Act of 1983 (MPRA). Miss. Code Ann. § 25-61-5 (Supp. 2015). DMR signaled its willingness to comply with the request, but the *Sun Herald* did not want to pay the associated costs. The *Sun Herald* submitted a second written request on December 27, 2012, for additional records. But during the period that DMR had to comply with this second request,[1] the Harrison County grand jury subpoenaed those same records, as well as the records covered by the November 14 request.[2]

¶2.     The subpoena, which was issued by the Auditor,[3] required DMR's records "to be 'retained in-place,'" to "be accessible upon demand by agents of [the Auditor]," and to "be released to *no entity other than* [*the Auditor*]." (Emphasis added). It also stated: "This subpoena . . . may be satisfied by mailing or delivering a certified copy of said records[.]" Because the subpoena prohibited DMR from releasing its records to the *Sun Herald*, DMR informed the *Sun Herald* in writing that it could no longer comply with the public-records

[1] *See* Miss. Code Ann. § 25-61-5(1)(a) ("No public body shall adopt procedures which will authorize the public body to produce or deny production of a public record later than seven (7) working days from the date of the receipt of the request for the production of the record."). The seven-day period was extended in this case due to the holidays.

[2] There were actually two subpoenas—January 6, 2013, and January 9, 2013. The only difference is the amount of records increased in the second subpoena. Both subpoenas will be collectively referred to as "the subpoena."

[3] The reference to "the Auditor" is used in a general sense for the sake of convenience and refers collectively to the Mississippi Office of the State Auditor and the Mississippi State Auditor, Stacey Pickering.

requests.

¶3.    On January 15, 2013, the Auditor took possession of the records pursuant to the subpoena. Almost all of the records had electronic copies. But a few records only existed as uncopied and unscanned originals.[4]

¶4.    The next day, on January 16, 2013, Gulf Publishing (GP), the publisher of the *Sun Herald,* sued DMR in Harrison County Chancery Court to compel production of the records. While service of a state entity like DMR must be upon the Attorney General, GP did not serve Attorney General Jim Hood, but instead DMR's director.

## II.    Protective Order

¶5.    A week later, special assistant attorneys general assigned to both DMR and the Auditor worked together to submit a protective order to the Harrison County Circuit Court. The circuit court judge found "the . . . subpoena . . . prohibit[ed DMR] from complying with the [MPRA]." Therefore the circuit court judge modified the subpoena to permit DMR to release to GP public records *in its possession*, even if those records were also subject to the subpoena. One day later, DMR downloaded 22,215 records to a DVD+R and handed it over to GP. The only records that were not released to GP were the uncopied and unscanned originals in the Auditor's possession.

## III.    First Hearing

¶6.    On April 23, 2013, the chancery court heard GP's claim. GP was still seeking the

---

[4] There were approximately three to four boxes worth of uncopied and unscanned originals scattered throughout approximately thirty-eight boxes and two filing cabinets—or sixty boxes total.

records, for which no electronic copy was available. DMR moved to dismiss, claiming GP failed to prove that DMR wrongfully denied the requests. The chancellor stated that she could "not force DMR to turn over records that they no longer possess or have access to[.]" Thus, the chancellor deemed the Auditor a "necessary party since they are the ones in physical custody and possession of all the documents that [GP] now seeks." The chancellor ended the hearing by giving GP permission to join the Auditor as a necessary party.

### IV.    Second Lawsuit

¶7.    GP did not file its motion to amend its first complaint until four months later, on August 16, 2013. On August 26, 2013, GP also filed an entirely new, separate lawsuit, naming DMR and the Auditor as defendants, which was properly served on the Attorney General. The motion to amend was granted on September 10, 2013.[5] The two lawsuits were later consolidated.

¶8.    DMR answered the second complaint by asserting that it had not wrongfully denied GP's requests, and that GP's claim had already been litigated in the first lawsuit. As part of its answer, the Auditor asserted the records in its possession were exempt under the MPRA's "investigative report" exemption. *See* Miss. Code Ann. § 25-61-3(f) (Supp. 2015).

### V.    Second Hearing

¶9.    The chancellor heard GP's second claim on October 30 and 31, 2013.

¶10.    During the hearing, the chancellor ordered the Auditor to bring the records to the

---

[5] The order began with the chancellor stating she had granted DMR's motion to dismiss for failure to join the Auditor as a necessary party. But then the order also grants GP's motion to amend its complaint to add the Auditor as a defendant. Later, in her final judgment, the chancellor would refute she ever granted DMR's motion to dismiss.

courthouse. However, by the time the records arrived, the chancellor had ruled from the bench that the records did not fall under the investigative-report exemption. Thus, the chancellor allowed the documents to be taken from the courthouse, and ordered the Auditor to copy the records or put DMR in a position to comply with GP's requests.

¶11. Though the chancellor would later rescind this statement, at the end of the hearing, the chancellor stated: "there has been no evidence presented to the [c]ourt that . . . DMR has done anything other than attempt to comply with the records request, at least based upon the evidence the [c]ourt has been presented." The chancellor reserved the right to add, alter, amend, and/or revise her bench ruling when reduced to writing.

## VI. Federal Subpoena

¶12. Before the chancellor's bench ruling was reduced to writing, the United States District Court for the Southern District of Mississippi issued a subpoena, commanding the Auditor's lead investigator, David Huggins, to appear the next day, November 5, at 9 a.m., at the federal building in Jackson—and bring all the DMR records in the Auditor's possession.

¶13. Around 2:40 p.m. on November 4, Investigator Huggins informed the Auditor's attorney, Melissa Patterson, of the federal subpoena. And around 5 p.m., Patterson notified the chancellor. Subsequently, Patterson and GP's attorney, Henry Laird, had a telephonic hearing with the chancellor. Laird suggested that Patterson seek a motion to quash or a protective order. But Patterson represented that she thought Investigator Huggins could, instead, appear before the grand jury and explain why he was unable to bring the records. The chancellor ended the hearing by ordering Patterson to produce the records to the

6

*chancery court*, by 9 a.m. on November 5.

¶14.    Shortly before midnight, the chancellor electronically filed an emergency order immediately seizing the records and ordering they be delivered to the chancery court so that they could be copied and Bates stamped before the Auditor complied with the federal subpoena.

¶15.    The next morning, on November 5, Patterson contacted Investigator Chris Lott with the Auditor to arrange transportation of the records to the chancery court, but learned Investigator Huggins had decided to transport the records to Jackson. Patterson notified the chancellor, and another hearing was held that day in which the chancellor found the Auditor was in contempt of her October 31 bench ruling and the hours-old emergency order.

¶16.    That same day, the state grand jury and federal grand jury indicted several individuals.

### VII.    Interlocutory Appeal

¶17.    On November 6, 2013, the Attorney General's Office submitted a motion to stay all further proceedings pending appeal. And on November 8, 2013, the Auditor submitted a combined motion to alter or amend the judgment, to vacate the November 4, 2013 order, and to stay all proceedings pending appeal. On December 3, the supreme court denied the Auditor's petition for an interlocutory appeal and motion to stay trial-court proceedings pending appeal.

### VIII.  Contempt

¶18.    On November 16, 2013, in an order for direction, the chancellor invited GP to file a motion for contempt because "the federal grand jury subpoena itself did not prevent or

7

restrict the copying of the original records requested by the subpoena." GP subsequently filed its motion for civil contempt and attorney's fees against the Auditor. GP never alleged DMR or any other individuals were in contempt.

¶19. The civil contempt hearing started on December 4. At the beginning of the hearing, the Auditor moved for the chancellor to recuse herself, as she had already found the Auditor to be in contempt and, thus, reasonably would be perceived as already having bias in this matter.[6] The chancellor stated the Auditor waived the issue and denied the motion.

¶20. To make its case for contempt, GP first called the Mississippi State Auditor, Stacey Pickering. Pickering testified that his office had to decide between either not complying with the federal subpoena or not complying with the chancery court's order. And his office chose to comply with the federal subpoena.

¶21. Investigator Huggins was then called to testify about the events leading up to the

---

[6] During the November 5 hearing, the chancellor stated:

I have no choice at this time but to find that the Auditor by acting in cooperation with the federal prosecutor is in direct contempt of my ruling and my order of last week on October 31st, and certainly in direct contempt of my protective order which I issued last night.

. . . .

The Auditor is in contempt of this [c]ourt by removing the records from this jurisdiction and from control of the [c]ourt which it has maintained since the beginning of this litigation.

. . . .

I am reserving a lot of matters . . . except for my initial finding that the State Auditor is in direct contempt of this [c]ourt's orders.

delivery of the records to the federal grand jury, instead of the chancery court. According to Investigator Huggins, John Dowdy, the Assistant United States Attorney who was running the federal side of the DMR investigation, contacted him on November 1.[7] Dowdy asked Investigator Huggins to come by the federal building on November 4, causing Investigator Huggins to suspect that he might be issued a subpoena. Already concerned about a federal subpoena, Investigator Huggins had spoken with Attorney General Hood, who advised, hypothetically, should a federal subpoena come down, Investigator Huggins should comply with it.

¶22.     On November 4, Investigator Huggins went by the federal courthouse, and, as suspected, was issued a federal subpoena. Investigator Huggins initially thought he could comply with both the chancery court's ruling and the federal subpoena. He had the records sealed and hoped that it would be enough to appear before the grand jury the next day and explain why he did not bring the records.

¶23.     Unbeknownst to Patterson, around 6 p.m., on November 4, Investigator Huggins decided that he had to show up at the federal grand jury—or face federal penalties. This decision was based on his conversation with Attorney General Hood as well as a conversation with Dowdy. Investigator Huggins told Dowdy his plan to try to comply with both the chancery court's ruling and the federal subpoena, but Dowdy advised Investigator Huggins to comply with the subpoena. Investigator Huggins then directed Investigator Lott to transport the records to Jackson.

---

[7] Dowdy also attempted to contact the chancellor; however, the chancellor did not speak with Dowdy or return his phone calls.

¶24. The contempt hearing ended with the Auditor informing the chancery court that necessary steps were being taken to release the records from the federal court.

### IX. Motion to Release

¶25. On December 5, 2013, the Auditor filed a motion with the district court seeking permission to release the records to GP. On December 20, the district court ruled the records were not subject to federal grand-jury secrecy and, therefore, could be released. *See United States v. Walker*, No. 1:13-CR-89-KS-MTP, 2013 WL 6805121, at *7 (S.D. Miss. Dec. 20, 2013).

¶26. Almost one year after its written request, GP obtained the records.

### X. Final Order

¶27. On May 27, 2014, the chancellor entered a sixty-seven page omnibus final order. Ultimately, the chancellor concluded:

(1)     GP's requests were not subject to any exemptions;

(2)     GP's requests were not subject to grand-jury secrecy;

(3)     Any unadjudicated, posttrial motions were denied;

(4)     DMR acted in bad faith, asserting defenses for the purpose of delay in violation of the Mississippi Litigation Accountability Act (MLAA);

(5)     DMR willfully and wrongfully denied GP's requests;

(6)     The Auditor also acted in bad faith and willfully and wrongfully denied GP's requests;

(7)     The Auditor was in civil contempt from November 4, 2013, until it purged itself on December 5, 2013. Therefore, the Auditor was liable for attorney's fees and expenses resulting from the contempt;

(8)    GP was awarded attorney's fees under the MPRA (Miss. Code Ann. § 25-61-15 (Supp. 2015)), the MLAA (Miss. Code Ann. § 11-55-5 (Rev. 2012)), and relevant caselaw for contempt and monetary sanctions for bad faith;

(9)    DMR and the Auditor were jointly and severally liable for $36,783.50 in attorney's fees and $1,249.95 in expenses; and

(10)   The following individuals were fined $100 each "pursuant to 25-61-15 . . . for their participation in the willful and wrongful denial of [GP's] public record requests":

> State Auditor Stacey Pickering
>
> Attorney General Jim Hood
>
> Lead Investigator David Huggins
>
> Investigator Chris Lott
>
> Special Assistant Attorney General Melissa Patterson
>
> Special Assistant Attorney General Joseph Runnels
>
> Special Assistant Attorney General Sandra Chesnut
>
> Special Assistant Attorney General Harold Pizzetta

**STANDARDS OF REVIEW**

¶28.   "This Court employs a limited standard of review when reviewing a chancellor's findings of fact. We will not disturb the findings of the chancellor unless he was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Questions of law are reviewed de novo." *Harrison Cty. Dev. Comm'n v. Kinney*, 920 So. 2d 497, 502 (¶9) (Miss. Ct. App. 2006) (internal citations omitted).

**DISCUSSION**

11

¶29. As a preliminary matter, we note that it has been asserted that because the records were subpoenaed, the circuit court was the proper place to seek redress for the release of the records. However, the MPRA vests jurisdiction of denial of a public-record request in the chancery court. Miss. Code Ann. § 25-61-13 (Supp. 2015).[8]

### I. DMR

¶30. We will address only those issues that have been "distinctly identified" by DMR. *See* M.R.A.P. 28(a)(3).

### A. MPRA—Denial of Requests

¶31. DMR claims the chancellor erred in finding that it willfully and wrongfully denied GP's public-record requests in violation of the MPRA.

¶32. Mississippi Code Annotated section 25-61-12 (Supp. 2015) provides: "[W]hen in the possession of a law enforcement agency, investigative reports shall be exempt from the provisions of this chapter[.]"

¶33. Mississippi Code Annotated section 25-61-3(f) defines investigative report as:

[R]ecords of a law enforcement agency . . . and generally will include, but not be limited to, the following matters . . . :

(i)     Records that are compiled in the process of detecting and investigating any unlawful activity or alleged unlawful activity, the disclosure of which would harm the investigation . . . ;

(ii)    Records that would reveal the identity of informants and/or witnesses;

(iii)   Records that would prematurely release information that would impede the public body's enforcement, investigative or detection efforts;

---

[8] Effective July 1, 2014, this section was amended giving the Mississippi Ethics Commission authority to compel access to public records.

(iv)    Records that would disclose investigatory techniques and/or results of investigative techniques;

(v)    Records that would deprive a person of a right to a fair trial or an impartial adjudication;

(vi)    Records that would endanger the life or safety of a public official or law enforcement personnel, or confidential informants or witnesses;

(vii)    Records pertaining to quality control or PEER review activities; or

(viii)    Records that would impede or jeopardize a prosecutor's ability to prosecute the alleged offense.

¶34.    The Auditor was a law-enforcement agency. However, the chancellor stated that the investigative-report exemption did not apply because the records were not *in the Auditor's possession* when DMR denied GP's requests. Although advisory, in March 2010, "[t]he Mississippi Ethics Commission [adopted] . . . model rules to provide information to record requestors and state and local agencies about 'best practices' for complying with the [MPRA]." Model Rule 4.4(4)(a) provides: "A public body is only required to provide access to public records it has in its possession *or over which it has control*." (Emphasis added). After DMR received the state grand-jury subpoena, it timely informed GP that it could no longer comply with GP's requests. The chancellor acknowledged that the subpoena "prohibited the release of the DMR records to anyone, <u>even prior to the return date</u>," except for the Auditor. Although the Auditor did not take physical possession of the records until after the time period prescribed by section 25-61-5(1)(a), the Auditor became the custodian—and was in constructive possession—of DMR's records as soon as the subpoena was served on DMR.

13

¶35. The chancellor also stated that because the records were not the *Auditor's* records, they were not investigative reports. *See* Miss. Code Ann. § 25-61-3(f) ("'Investigative report' means records of a law enforcement agency[.]"). However, the Mississippi Ethics Commission stated in Public Records Opinion No. R-13-017:

> [T]he term "public records" under the [MPRA] includes records obtained from a third party and possessed or retained by a law enforcement agency in the course of investigation of criminal matters under the agency's jurisdiction. While those records may not belong to the law enforcement agency, those records, while in possession of the law enforcement agency, are subject to the [MPRA].

¶36. The records sought by GP were investigative reports that fall within the enumerated examples listed in section 25-61-3(f). Investigator Lott testified that the records would disclose the identity of witnesses and impede the ongoing DMR investigation. Investigator Lott also testified that he "used everything that's listed in [the] subpoena as part of the investigation." Accordingly, the chancellor erred in finding DMR violated the MPRA when it denied GP's requests and when it found the investigative-report exemption did not apply. Therefore, we reverse and render the judgment against DMR for violation of the MPRA.

### B. MLAA

¶37. DMR claims the chancellor erred in finding that it violated the MLAA and was liable for resulting attorney's fees, costs, and expenses.

¶38. Mississippi Code Annotated section 11-55-5(1) provides:

> [I]f the court—on its own motion or the motion of any party—"finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct,"

14

then "the court shall award as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs."

*Waldrup v. Eads*, 180 So. 3d 820, 829 (¶43) (Miss. Ct. App. 2015) (quoting Miss. Code Ann. § 11-55-5(1)).

¶39. The chancellor faulted DMR for failing to properly keep its records and cited to Mississippi Code Annotated section 25-59-15 (Rev. 2010) for support. Specifically, the chancellor stated that DMR was under an "affirmative duty to maintain a back up copy of the complete set of records it was charged to keep as a public body." However, nothing in section 25-59-15 requires every public record to be backed up with paper or electronic copies.

¶40. The chancellor also faulted DMR for not joining the Auditor as a necessary party, which "interposed delay and unnecessarily expanded the litigation." However, DMR was under no duty to join the Auditor as a necessary party. Therefore, we reverse and render the judgment against DMR for violation of the MLAA.

### C. Recanted Rulings

¶41. DMR claims the chancellor erred in recanting her previous rulings that were in favor of DMR in order to render a judgment against DMR. Because we find that DMR did not violate the MPRA or the MLAA, we do not need to address this issue.

### II. The Auditor

#### A. MPRA—Denial of Requests

¶42. The Auditor claims that the chancellor erred in finding it willfully and wrongfully denied GP's requests in violation of the MPRA.

15

¶43.    Because the investigative-report exemption applied, the chancellor erred in finding that the Auditor violated the MPRA when it denied GP's requests.[9]  Therefore, we reverse and render the judgment against the Auditor for violation of the MPRA.

### B.    Recusal

¶44.    The Auditor also claims that the chancellor erred in denying its motion to recuse, which was filed on December 3, 2013—the day before the contempt hearing.  The motion was based on the chancellor's statements on November 5, 2013, finding the Auditor in contempt.  However, the chancellor found that the Auditor waived its motion for recusal.  Specifically, the chancellor stated:

> [T]o the extent that the motion is based upon any of the [c]ourt's statement[s] of the in-chambers conference on November the 5th, that . . . portion of the motion would be necessarily waived.  The [Auditor] has filed many motions with this [c]ourt since that date and has not sought recusal based upon that until now, so that would be untimely to the extent that it's based on that transcript[.]

¶45.    Uniform Chancery Court Rule 1.11 states in relevant part that a motion for recusal "shall be filed within 30 days after the filing party could reasonably discover the facts underlying the grounds asserted."  However, "[o]ver the years, this Court has been quick to point out that we will not allow a party to take his chances with a judge about whom he knows of grounds for recusal and then, after he loses, file his motion." *Wilbanks v. Gray*, 795 So. 2d 541, 547 (Miss. Ct. App. 2001) (quoting *Buchanan v. Buchanan*, 587 So. 2d 892,

---

[9] We note that GP never submitted a public-record request to the Auditor.  Once the Auditor had been brought in as a defendant, GP filed a request for production of documents.  However, this is not a public-record request pursuant to MPRA.  Nor should GP be able to use discovery to circumvent the very purpose of the lawsuit.

897 (Miss. 1991)). "Where the party knew of the grounds for the motion or with the exercise of reasonable diligence may have discovered those grounds and where that party does not move timely prior to trial, the point will be deemed waived." *Id.* (quoting *Buchanan*, 587 So. 2d at 897).

¶46. Between November 5, 2013, and the filing of the motion to recuse, the Auditor filed a motion for leave to file pleadings under seal; a combined motion to alter or amend the judgment, to vacate the November 4, 2013 order, and to stay all proceedings; a notice of appeal; a notice of intent to seek closure of the hearing; and a motion with respect to the closure of the hearing.[10] Because there was no adverse ruling and because the motion for recusal was filed within the prescribed thirty days, the chancellor erred in finding that the Auditor waived its motion to recuse. We proceed to address the merits of this issue.

¶47. At the contempt hearing, the chancellor stated that the Auditor's alleged contempt[11] was civil; however, "[t]he often confused labels that a trial judge uses in contempt charges do not control; the clarity or ambiguity of the contempt order as well as the procedures followed to enter the contempt sanctions are what govern." *Miss. Comm'n on Judicial Performance v. Byers*, 757 So. 2d 961, 971 (¶43) (Miss. 2000). Criminal contempt is

---

[10] During this time, the Attorney General's Office also filed its motion to stay all further proceedings pending appeal.

[11] The chancellor cited to an off-the-record conversation that took place between her and Attorney General Hood; an alleged conspiracy between the United States Attorney's Office, the Attorney General's Office, and the Auditor; the Auditor's reliance upon the Attorney General's advice to disregard the chancery court's rulings; the Auditor's failure to copy the records; the Auditor's failure to move for a protective order or file a motion to quash; and the Auditor's issuance of unnecessary state grand-jury subpoenas.

"designed to punish the contemnor for disobedience of a court order." *In re Williamson*, 838 So. 2d 226, 237 (¶29) (Miss. 2002). Unlike civil contempt, from which a person can purge himself by complying with the court order, criminal contempt punishes the past offenses and does not terminate upon the person's complying with the order. *Id*. The content of the final order indicates the chancellor was punishing the Auditor for choosing to comply with the federal subpoena versus her bench ruling and protective order. Furthermore, although the chancellor stated that the release of the records purged the Auditor of the contempt, the chancellor found that "the willful and contumacious contempt by the . . . Auditor warrant[ed] sanctions of court costs and reasonable attorney's fees against the . . . Auditor." The chancellor then ordered that the Auditor be "liable for reasonable attorney's fees, costs[,] and expenses resulting from [the] contempt." Accordingly, we find the alleged contempt was criminal.

¶48.    Moreover, the alleged contempt appears to be constructive. "[C]onstructive contempt involves actions which are committed outside the presence of the court." *Id.* at (¶31). The allegations of contempt were committed outside the presence of the court; therefore, the alleged acts constituted constructive criminal contempt. *See id.* In cases of constructive criminal contempt,

> [w]here the trial judge has substantial personal involvement in the prosecution, the accused contemnor must be tried by another judge. Examples of substantial personal involvement in the prosecution warranting recusal include cases where the trial judge acts as a one-man grand jury, where the trial judge is instrumental in the initiation of the constructive-contempt proceedings, and where the trial judge acts as prosecutor and judge.

*In re McDonald*, 98 So. 3d 1040, 1044 (¶9) (Miss. 2012) (quotation marks omitted). Because

18

the chancellor cited the contempt, she should have recused. *See In re Smith*, 926 So. 2d 878, 888 (¶14) (Miss. 2006) (finding the citing judge must recuse himself from conducting the constructive-contempt proceeding involving the charges). We would typically reverse the judgment of contempt and remand for a contempt hearing before another judge. *See Williamson,* 838 So. 2d at 238 (¶34). However, we have already found that the Auditor was protected by the investigative-report exemption. Furthermore, the Auditor was faced with the choice of complying with the chancellor's bench ruling and protective order or complying with the federal subpoena. Any noncompliance with the chancellor's bench ruling or protective order was not willful or contemptuous. *See R.K. v. J.K.*, 946 So. 2d 764, 778 (¶41) (Miss. 2007). Therefore we reverse and render the chancellor's judgment of contempt.[12]

### III.    Individuals[13]

¶49.    Pickering, Hood, Huggins, Lott, Patterson, Runnels, Chesnut, and Pizzetta claim the chancellor erred in imposing a fine of $100 each under Mississippi Code Annotated section 25-61-15 for their "participation in the willful and wrongful denials of [GP's] public records requests pursuant to the [MPRA]."

¶50.    The Fourteenth Amendment to the United States Constitution and Section Fourteen

---

[12] GP filed a motion for costs and attorney's fees on appeal. "This Court has generally awarded attorney's fees on appeal in the amount of one-half of what was awarded in the lower court." *Lauro v. Lauro*, 924 So. 2d 584, 592 (¶33) (Miss. Ct. App. 2006) (citing *Monroe v. Monroe*, 745 So. 2d 249, 253 (¶17) (Miss. 1999)). Because we reverse the chancellor's award of costs and attorney's fees at trial, the motion for costs and attorney's fees on appeal is denied.

[13] GP did not address this issue in its appellate brief. Furthermore, at oral argument, counsel for GP stated, "[GP] does not seek any relief against anybody except DMR and [the Auditor]."

of the Mississippi Constitution prohibit deprivation of property without due process of law. "Generally, due process requires notice and a meaningful opportunity to be heard." *Akins v. Miss. Dep't of Revenue*, 70 So. 3d 204, 208 (¶12) (Miss. 2011). Furthermore, the putative target of any claim in a civil lawsuit is always entitled to process, even if independent knowledge of the lawsuit exists. *Sanghi v. Sanghi*, 759 So. 2d 1250, 1257 (¶33) (Miss. Ct. App. 2000).

¶51.    None of the individuals were named in either lawsuit in their individual capacity or given notice that they could potentially be fined. By failing to provide the individuals with notice of the alleged MPRA violations and charges to be adjudicated against them, the chancellor violated their due-process rights. For this reason, the fines are void. *See Adams v. Miss. State Oil & Gas Bd.*, 80 So. 3d 869, 872 (¶15) (Miss. Ct. App. 2012) ("A judgment is void only if the court that rendered it . . . acted in a manner inconsistent with due process of law.").

### IV.    Posttrial Motions

¶52.    DMR, Runnels, and Chesnut claim the chancellor erred in denying their motion to alter or amend the judgment. In their appellate brief, they stated that "[t]he motion raised the same manifest errors of law discussed in this brief." Because we reverse and render, we do not need to address this issue.

¶53.    **THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**IRVING AND GRIFFIS, P.JJ., FAIR, JAMES AND GREENLEE, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH**

**SEPARATE WRITTEN OPINION.  BARNES, ISHEE AND WILSON, JJ., NOT PARTICIPATING.**

**CARLTON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶54.    I respectfully concur in part and dissent in part from the majority's opinion.  I agree with the majority's opinion that another judge needed to hear and determine the issue of contempt.  However, I disagree with the majority's determination that the DMR records in the Auditor's possession were exempt from disclosure under the MPRA as law-enforcement investigative records.  I would reverse the chancellor's judgement of contempt and remand this case for a contempt hearing before another judge.

¶55.    This case reflects that the disputed records are public records created, compiled, or retained by the DMR and that the Auditor's office later obtained custody of the records from the DMR.[14] *See United States v. Walker*, No. 1:13-CR-89-KS-MTP2013, 2013 WL 6805121, at *3 (S.D. Miss. Dec. 20, 2013) (finding by the federal district court that the records at issue constituted DMR public records).[15]  The records at issue were created, possessed, or retained by a public body, the DMR, in the course of its performance and function as a public body.[16]

---

[14] *See* Miss. Code Ann. § 25-61-3(a) (Supp. 2015) (defining a public body).

[15] In *Walker*, the federal district court found that the DMR records at issue were not part of a matter that occurred before a grand jury and that the government failed to represent that the DMR records were or ever would be presented to a grand jury.  *Walker*, 2013 WL 6805121, at *3.  The federal district court also determined the records to be DMR public records.  *Id.*  The federal district court found that the DMR records would not reveal anything regarding the internal operations of the grand jury.  *Id.* at *5.  The district court authorized the release of the DMR records after finding that Federal Rule of Criminal Procedure 6(e) did not prevent disclosure since the records were not a matter that occurred before the grand jury and did not reveal internal operations of the grand jury.  *Id.* at *6-7.

[16] *See* Miss. Code Ann. § 25-61-3(b) (Supp. 2015) (defining public records).

21

Stated otherwise, the DMR records at issue were not created or compiled by the Auditor's office for a law-enforcement purpose. Instead, the records were independently created by another source, the DMR, which is a public body, in the course of the DMR's performance as a public body.[17]

¶56. The DMR records at issue are not law-enforcement records that were compiled or created by or for a law-enforcement agency for the purpose of a criminal investigation.[18] Mississippi Code Annotated section 25-61-12(2)(a) (Supp. 2015) exempts only investigative reports when in the possession of a law-enforcement agency.[19] The Auditor's custody of the DMR public records at issue failed to convert those public-agency records to investigative reports.

¶57. The MPRA, codified at Mississippi Code Annotated sections 25-61-1 to -17 (Rev. 2010 & Supp. 2015), provides the public with access to public records. The DMR public records at issue should have been disclosed since the records were not exempt as law-enforcement reports. As a result, I would reverse the chancellor's judgment and remand this case for further proceedings. I agree with the majority's finding that, if this matter were remanded, another judge should preside over the contempt hearing. I therefore respectfully

---

[17] Any record of a public body constitutes a public record, in accordance with Mississippi Code Annotated section 25-61-3 (Supp. 2015), notwithstanding their retention outside the public body. *See* Miss. Att'y Gen. Op., 1998-0641, 1998 WL 958143, *Hilliard* (Dec. 11, 1998).

[18] *See* Miss. Code Ann. § 25-61-3(f) (Supp. 2015); Miss. Code Ann. § 25-61-12 (Supp. 2015).

[19] *See also* Miss. Code Ann. § 25-61-3(f) (defining investigative report).

22

concur in part and dissent in part from the majority's opinion.