BEAM, JUSTICE, FOR THE COURT:
 

 ¶ 1. The Court of Appeals reversed and rendered a final judgment entered by the Harrison County Chancery Court, in which the chancery court held that: (1) Gulf Publishing's (GP) records request under the Mississippi Public Records Act (MPRA) was not subject to any exemptions contained in the act; (2) the Department of Marine Research (DMR) acted in bad faith by asserting defenses for the purpose of delay in violation of the Mississippi Litigation Accountability Act (MLAA); (3) DMR willfully and wrongfully denied GP's records requests; (4) the State Auditor acted in bad faith and willfully and wrongfully denied GP's requests; (5) the State Auditor was in civil contempt from November 4, 2013, until it purged itself on December 5, 2013, when it filed a motion with the federal district court, seeking permission to release the records requested by GP, which were then in the custody of a federal grand jury; therefore, the State Auditor was liable for attorney's fees and expenses resulting from the contempt; (6) GP was entitled to attorney's fees under the MPRA, the MLAA, and relevant caselaw for contempt and monetary sanctions for bad faith; (7) DMR and the State Auditor were jointly and severally liable for attorney's fees and other expenses; and (8) the following individuals were fined $100 each pursuant to the MPRA, for their participation
 in the willful and wrongful denial of GP's public-records request: State Auditor Stacey Pickering, Attorney General Jim Hood; Director of Investigations David Huggins, Investigator Chris Lott, Special Assistant Attorneys General Melissa Patterson, Joseph Runnels, Sandra Chestnut, and Harold Pizzetta.
 

 ¶ 2. GP petitioned this Court for writ of certiorari, which was granted. Having reviewed the record and considered GP's claim(s), we find the Court of Appeals should not have reached the question of whether the investigative-report exemption under the MPRA applied in this instance. As will be explained, that claim was waived. Therefore, that portion of the Court of Appeals' judgment holding that the public records sought by GP were exempt under the MPRA's investigative-report exemption is overruled.
 

 ¶ 3. We find that the Department of Audit, as a public body defined by Mississippi Code Section 25-61-3(a), is liable to GP for the civil penalty prescribed Mississippi Code Section 25-61-15, along with reasonable expenses and attorney's fees as found by the chancery court, for denying GP access to public records not exempt from the provisions of the MPRA.
 
 [1]
 

 ¶ 4. Also, we find no error in the chancery court's decision to fine Huggins $100 under the penalty provision contained in MPRA.
 
 See
 

 Miss. Code Ann. § 25-61-15
 
 (Rev. 2010).
 

 FACTS AND PROCEDURAL HISTORY
 

 [2]
 

 ¶ 5. In 2012, a joint federal and state task force began investigating DMR for misappropriation of funds. The investigation lead to the indictments and convictions of several individuals, including former DMR Director Dr. Bill Walker; DMR Chief of Staff Joe Ziegler; DMR official Tina Shumate; D'Iberville City Manager Michael Janus; and Dr. Walker's son, Scott Walker.
 

 ¶ 6. During the investigation, on November 14, 2012, GP's subsidiary newspaper,
 
 The Sun Herald
 
 , submitted a written records request
 
 [3]
 
 to DMR, in accordance with Mississippi Code Section 25-61-5 of the MPRA.
 
 Miss. Code Ann. § 25-61-5
 
 (Rev. 2010). DMR communicated its willingness to comply with the newspaper's request,
 but DMR and the newspaper could not agree on costs.
 

 ¶ 7. The newspaper submitted a second request on December 27, 2012, for additional records.
 
 [4]
 
 Before DMR's compliance or response was due, the Harrison County grand jury subpoenaed the same records covered by the newspaper's November 14 and December 27 requests.
 

 ¶ 8. The subpoenas, issued at the behest of the Department of Audit on January 6 and 9, 2013, required DMR's records to "to be 'retained in-place,' " to "be accessible upon demand by agents of the Mississippi Office of State Auditor," and to "be released to no entity other than [the Department of Audit]." The subpoenas also stated, "This subpoena ... may be satisfied by mailing or delivering a certified copy of said records[.]" Alleging the subpoenas prohibited DMR from releasing its records to anyone other than the state auditor, DMR informed
 
 The Sun Herald
 
 in writing that it could no longer comply with the public-records requests.
 

 ¶ 9. On January 15, 2013, the Department of Audit took possession of the records pursuant to the subpoenas. Almost all of the records had electronic copies. But a few records existed as uncopied and unscanned originals.
 

 ¶ 10. The next day, on January 16, 2013, GP sued DMR in the Harrison County Chancery Court to compel production of the records, without service upon the Attorney General, but instead upon DMR's director.
 

 ¶ 11. A week later, on January 22, 2013, special assistant attorneys general assigned to both DMR (Joseph Runnels) and the Department of Audit (Melissa Patterson), worked together to submit a protective order to the Harrison County Circuit Court.
 
 [5]
 
 DMR filed the motion for protective order in the circuit court, and the Department of Audit, through Patterson, signed off on the motion. The circuit court found "the ... subpoena ... prohibit[ed DMR] from complying with the [MPRA]." Therefore, the circuit court modified the subpoena to permit DMR to release to GP public records in its possession, even if those records also were subject to the subpoena.
 

 ¶ 12. On January 23, 2013, Counsel for GP Henry Laird and Counsel for DMR Runnels appeared before the chancery court. Laird told the chancery court that the parties were still working on a resolution and announced that he did not see any reason to go forward with the expedited hearing set for that day. Laird said there were two categories of records, one computerized, the other comprised of hard copies, which were voluminous.
 
 [6]
 
 According to Laird, they were attempting to work out an arrangement for GP to have access to the boxes containing the hard copies so GP could identify what documents, if any, within those boxes they wanted, and then have DMR make copies for GP.
 

 ¶ 13. Days later, DMR downloaded 22,215 records to a "DVD+R" and handed it over to GP. The only records that were not released to GP were the uncopied and unscanned originals no longer in DMR's
 possession, but in the Department of Audit's possession.
 

 ¶ 14. Another hearing was held on April 23, 2013, at which the chancery court heard GP's claim that it was still seeking the records for which no electronic copy was available. DMR moved to dismiss, claiming GP had failed to prove that DMR wrongfully had denied the requests. The chancery court said it could "not force DMR to turn over records that they no longer possess or have access to [.]" Thus, the chancery court deemed the Department of Audit a "necessary party since they are the ones in physical custody and possession of all the documents that [GP] now seeks." The court ended the hearing by giving GP permission to join the Department of Audit as a necessary party.
 

 ¶ 15. GP filed a motion to amend its first complaint four months later, on August 16, 2013. And on August 26, 2013, GP filed a new, separate lawsuit, naming DMR and the Department of Audit as defendants, which was properly served on the Attorney General. The motion to amend was granted on September 10, 2013. The two lawsuits were consolidated.
 

 ¶ 16. DMR answered the second complaint by asserting that it had not wrongfully denied GP's requests, and that GP's claim already had been litigated in the first lawsuit. As part of its answer, the Department of Audit asserted the records in its possession were exempt under the MPRA's "investigative report" exemption.
 
 See
 

 Miss. Code Ann. § 25-61-3
 
 (f) (Supp. 2016).
 

 ¶ 17. The chancery court heard GP's second claim on October 30 and 31, 2013. During the hearing, the chancellor instructed the Department of Audit to bring the records to the courthouse. Before the records arrived, the chancery court had ruled from the bench that the records did not fall under the investigative-reports exemption. The chancery court allowed the documents to be taken from the courthouse and instructed the Department of Audit to copy the records or put DMR in a position to comply with GP's requests.
 

 ¶ 18. Though the chancery court later would rescind this statement, the court stated at the end of the hearing that "there has been no evidence presented to the [c]ourt that ... DMR has done anything other than attempt to comply with the records request, at least based upon the evidence the [c]ourt has been presented." The chancery court, however, reserved the right to add, alter, amend, and/or revise her bench ruling when reduced to writing.
 

 ¶ 19. That same day, on October 31, an Assistant United States Attorney (AUSA) attempted to contact the chancellor. The chancellor did not speak with the AUSA or return his phone calls.
 

 Federal Subpoena
 

 ¶ 20. Before the chancery court's bench ruling was reduced to writing, the Clerk of Court for the United States District Court for the Southern District of Mississippi, through the AUSA, issued a subpoena on November 4, 2013, commanding the Department of Audit's Director of Investigations, Huggins, to appear the next day, at 9 a.m., at the federal building in Jackson, Mississippi, and to bring all the DMR records in the Department of Audit's possession.
 

 ¶ 21. Around 2:40 p.m. on November 4, Huggins informed the Department of Audit attorney, Melissa Patterson, of the federal subpoena. At around 5 p.m. that evening, Patterson notified the chancellor. Subsequently, at approximately 7:00 p.m. that evening, Patterson and GP's attorney, Laird, had a telephonic hearing with the chancellor. Laird suggested that Patterson seek a motion to quash or a protective
 order. But Patterson represented that she thought Huggins could, instead, appear before the grand jury and explain why he was unable to bring the records.
 
 [7]
 
 The chancery court ended the hearing by ordering Patterson to produce the records to the chancery court by 9 a.m. on November 5.
 

 ¶ 22. Shortly before midnight on November 4, the chancellor electronically filed an emergency order immediately seizing the records and ordering they be delivered to the chancery court so they could be copied and Bates-stamped before the Department of Audit complied with the federal subpoena.
 

 ¶ 23. The next morning, on November 5, Patterson contacted Investigator Chris Lott with the Department of Audit to arrange transportation of the records to the chancery court, but learned the records already had been transported to Jackson. Patterson notified the chancellor, and another hearing was held that day in which the chancellor found the Department of Audit in contempt of her October 31 bench ruling and subsequent emergency order filed by the court on the Mississippi Electronic Courts (MEC) system the night before on November 4, directing the Department of Audit to deliver the DMR records to the Harrison County Courthouse at 9 a.m.
 

 ¶ 24. The chancery court issued a bench ruling on November 5, announcing:
 

 I have no choice at this time but to find that the Auditor by acting in cooperation with the federal prosecutor is in direct contempt of my ruling and my order of last week on October 31, and certainly in direct contempt of my protective order which I issued last night. Now, even if the Auditor cooperated with the federal prosecutor pursuant to the subpoena prior to my protective order being issued last night, nevertheless, the Auditor was certainly aware and under this Court's order to turn the documents over to the DMR.
 

 ¶ 25. That same day, on November 5, the state grand jury and the federal grand jury indicted several individuals in relation to the DMR investigation.
 

 Interlocutory Appeal
 

 ¶ 26. On November 6, 2013, the Attorney General's Office submitted a motion in the chancery court to stay all further proceedings pending appeal. And on November 8, 2013, the Department of Audit submitted a combined motion to alter or amend the judgment, to vacate the November 4, 2013, order, and to stay all proceedings pending appeal. On November 21, 2013, the Department of Audit petitioned this Court for interlocutory appeal, along with a motion to stay the chancery court proceedings. On December 3, this Court denied both the petition for interlocutory appeal and the motion to stay.
 

 Contempt
 

 ¶ 27. On November 16, 2013, in an order for direction, the chancellor invited GP to file a motion for contempt because "the federal grand jury subpoena itself did not prevent or restrict the copying of the original records requested by the subpoena." GP subsequently filed its motion for civil contempt and attorney's fees against the Department of Audit. GP did not allege that DMR or any other individuals were in contempt.
 

 ¶ 28. The civil contempt hearing started on December 4, 2013. At the beginning of the hearing, the Department of Audit
 moved for the chancellor to recuse herself, as she already had found the Department of Audit to be in contempt and, thus, reasonably would be perceived as already having bias in this matter. The chancellor held that the Department of Audit had waived the issue and denied the motion.
 

 ¶ 29. To make its case for contempt, GP first called State Auditor Stacey Pickering to testify as to why his office chose to comply with the federal subpoena.
 

 ¶ 30. Huggins was then called to testify about the events leading up to the delivery of the records to the federal grand jury, instead of the chancery court. According to Huggins, the AUSA, who was running the federal side of the DMR investigation, contacted him on November 1, 2013. The AUSA asked Huggins to come by the federal building on November 4, causing Huggins to suspect that he might be issued a subpoena. Already concerned about a federal subpoena, Huggins had spoken with Attorney General Hood, who advised, hypothetically, should a federal subpoena come down, Huggins should comply with it.
 

 ¶ 31. Huggins voluntarily went to the federal courthouse on November 4 and was issued a federal subpoena. Huggins said he initially thought he could comply with both the chancery court's ruling and the federal subpoena. He had the records sealed and hoped that would be enough to appear before the grand jury the next day and explain why he did not bring the records.
 

 ¶ 32. Unbeknownst to Patterson, around 6 p.m. on November 4, Huggins decided he had to show up at the federal grand jury or face federal penalties. Huggins said his decision was based on his conversation with Attorney General Hood as well as a conversation with the AUSA. Huggins told the AUSA his plan to try to comply with both the chancery court's ruling and the federal subpoena, but the AUSA advised Huggins to comply with the subpoena. Huggins testified that he called Lott at approximately 6:00 p.m. on November 4. Huggins told Lott that he (Huggins) had been directed by the AUSA to have these records in Jackson by 9:00 a.m. on November 5. Huggins said Lott called him an hour later and said, "We've decided to move tonight."
 

 ¶ 33. The contempt hearing ended with the Department of Audit informing the chancery court that necessary steps were being taken to release the records from the federal court.
 

 Motion to Release
 

 ¶ 34. On December 5, 2013, the Department of Audit filed a motion with the federal district court seeking permission to release the records to GP. On December 20, the federal district court ruled the records were not subject to federal grand-jury secrecy and, therefore could be released.
 
 See
 

 United States v. Walker
 
 , No. 1:13-CR-89-KS-MTP,
 
 2013 WL 6805121
 
 , at *7 (S.D. Miss. Dec. 20, 2013).
 

 ¶ 35. Pursuant to the federal district court order, on December 27, 2013, the AUSA released the records to the Department of Audit, which then delivered them to the chancery court. Over the next two to three weeks, GP inspected and copied in part the records under supervision of the chancery court.
 

 Final Order
 

 ¶ 36. On May 27, 2014, the chancellor entered a sixty-seven-page omnibus final order. Ultimately, the chancellor concluded:
 

 (1) GP's requests were not subject to any exemptions;
 

 (2) GP's requests were not subject to grand-jury secrecy;
 

 (3) Any unadjudicated, posttrial motions were denied;
 

 (4) DMR acted in bad faith, asserting defenses for the purpose of delay in violation of the Mississippi Litigation Accountability Act (MLAA);
 

 (5) DMR willfully and wrongfully denied GP's requests;
 

 (6) The Department of Audit also acted in bad faith and willfully and wrongfully denied GP's requests;
 

 (7) The Department of Audit was in civil contempt from November 4, 2013, until it purged itself on December 5, 2013. Therefore, the Department of Audit was liable for attorney's fees and expenses resulting from the contempt;
 

 (8) GP was awarded attorney's fees under the MPRA (
 
 Miss. Code Ann. § 25-61-15
 
 (Supp. 2016) ), the Mississippi Litigation Accountability Act (MLAA) (
 
 Miss. Code Ann. § 11-55-5
 
 (Rev. 2012)), and relevant caselaw for contempt and monetary sanctions for bad faith;
 

 (9) DMR and the Department of Audit were jointly and severally liable for $36,783.50 in attorney's fees and $1,249.95 in expenses; and
 

 (10) The following individuals were fined $100 each "pursuant to 25-61-15 ... for their participation in the willful and wrongful denial of [GP's] public record requests":
 

 Auditor Stacey Pickering
 

 Attorney General Jim Hood
 

 Lead Investigator David Huggins
 

 Investigator Chris Lott
 

 Special Assistant Attorney General Melissa Patterson
 

 Special Assistant Attorney General Joseph Runnels
 

 Special Assistant Attorney General Sandra Chesnut
 

 Special Assistant Attorney General Harold Pizzetta
 

 DISCUSSION
 

 ¶ 37. As the Court of Appeals correctly found, the Department of Audit is considered a law-enforcement agency. And as a law-enforcement agency, investigative reports in the agency's possession are exempt from the MPRA.
 
 Miss. Code Ann. § 25-61-12
 
 (2)(a) (Supp. 2016).
 

 ¶ 38. But as evinced by the language of the subpoenas issued at the behest of the Department of Audit, the documents sought from DMR were original business records "having been used, being in use, or prepared, possessed or retained for use in the conduct, transaction or performance of any business, transaction, work, duty or function of [DMR], or required to be maintained by [DMR]."
 
 Miss. Code Ann. § 25-61-3
 
 . Each subpoena was nearly identical to the records requests previously sought by
 
 The Sun Herald
 
 .
 

 ¶ 39. On appeal, the appellants assert (as did the Department of Audit in the chancery court) that these documents are exempt under the MPRA under grand-jury secrecy principles. But as the chancery court found, any such claim was waived in this case.
 

 ¶ 40. Again, GP sued DMR in chancery court under the MPRA after DMR informed GP it could no longer comply with GP's record request due to the two grand jury subpoenas that were issued to DMR. After GP filed suit against DMR, special assistant attorneys general assigned to both DMR and the Department of Audit, along with the Attorney General's Office, drafted and submitted a "protective order" on behalf of DMR to the circuit court requesting that the circuit court modify the grand jury subpoena(s) so as to allow
 DMR to release to GP copies of the public records in DMR's possession.
 
 [8]
 

 ¶ 41. The circuit court signed the order. But the order was limited to only those records that remained in DMR's possession, via electronic copies. The order did not provide for the unscanned and uncopied originals in the Department of Audit's possession.
 

 ¶ 42. Thereafter, GP filed a new lawsuit naming DMR and the State Auditor as defendants. As part of its answer, the Department of Audit claimed that the records in its possession were exempt under the MPRA's investigative-report exemption. No defense was asserted in the Department of Audit's answer that these records were subject to grand-jury secrecy laws.
 

 ¶ 43. The chancery court heard GP's claims against DMR and the Department of Audit on October 30 and 31, 2013. Testimony was provided at the hearings by two investigators for the Department of Audit in support of the Department of Audit's claim that the records in its possession fell under the MPRA's investigative-report exemption. The investigators said these records would disclose the identity of witnesses and impede the ongoing DMR investigation.
 

 ¶ 44. But the investigators testified in general terms only. And their testimonies provided no explanation or even illustration as to how the uncopied original records in the Department of Audit's possession differed in any way from those records also in the Department of Audit's possession but for which DMR retained electronic copies.
 

 ¶ 45. This, coupled with the fact that a "protective order" drafted by the aforementioned special assistant attorneys general only partly modified the grand-jury subpoena(s), leads us to no other conclusion than that reached by the chancery court: the uncopied original documents in the Department of Audit's possession did not constitute "investigative reports" exempted by the MPRA.
 

 ¶ 46. With much respect for the dissent, this is not the only reason why we agree with the chancery court's decision in this case.
 

 ¶ 47. As mentioned, each subpoena contained the following language: "This data is to be 'retained in-place' and shall be accessible upon demand by agents of the Mississippi Office of the State Auditor and
 
 shall be released to no entity other than the Mississippi Office of the State Auditor
 
 ." (Emphasis added.) This language extended beyond a requirement to produce documents to the grand jury, and was akin to a writ of mandamus or prohibition, that prohibited a governmental official from performing a specific act. In other words, it can be construed as requiring DMR not to honor a pending MPRA request.
 
 See
 
 e.g.,
 
 Farson, Son & Co. v. Bird
 
 ,
 
 248 U.S. 268
 
 , 270,
 
 39 S.Ct. 111
 
 , 111,
 
 63 L.Ed. 233
 
 (1919) ("[T]he prayer was that the county treasurer be mandamused to pay...."). We also recognize, as did the chancery court, that throughout all proceedings, all investigative agencies, state and federal, had access to these records.
 

 ¶ 48. Moreover, when the federal district court examined these documents for purposes of Rule 6(e) of the Federal Rules of Criminal Procedure, it found as follows:
 

 [T]he documents are public records created by DMR and obtained by the State Auditor independent of the grand jury proceedings. The record contains no indication
 that disclosure would endanger the secrecy of the grand jury, which is the substantive purpose of Rule 6(e)(2). Therefore, based on the information currently before the Court, the DMR records are not a "matter occurring before the grand jury," and they are not subject to Rule 6(e)'s secrecy requirement.
 

 ...
 

 Accordingly, the Court finds that the need for the DMR records to remain secret is outweighed by the State Auditor's need to comply with the Chancery Court's order, the Chancery Court's obligation to enforce Mississippi's Public Records Act, and the principle of comity.
 

 United States v. Walker
 
 , No.1:13-CR-89-KS-MTP,
 
 2013 WL 6805121
 
 , at **3, 6 (S.D.Miss. Dec. 20, 2013).
 

 ¶ 49. For these reasons, we find that the chancery court did not abuse its discretion in finding that the Department of Audit violated the MPRA by denying GP access to the public records.
 
 [9]
 

 ,
 

 [10]
 
 Even though the Department of Audit was not an original party to these proceedings, the Department of Audit delayed and expanded this litigation with a series of actions that defeated GP's records request, beginning with the issuance of subpoenas demanding that no one else have access to the public records sought by GP. And when the chancery court ultimately decided that these documents were not exempt under the MPRA, the Department of Audit continued to frustrate GP's records request. The Department of Audit therefore is liable for expenses and attorney's fees in the amounts found and calculated by the chancery court.
 
 [11]
 

 ¶ 50. We disagree with the chancery court's finding that DMR violated the MPRA. The record illustrates, as the chancery court initially found, that DMR acted in good faith to resolve the public-records request. Accordingly, we find that DMR is not joint and severally liable for attorney's fees, costs, and expenses, and we vacate that portion of the judgment.
 

 ¶ 51. Additionally, we find no error in the chancery court's decision to fine Huggins $100 under Section 25-61-15. The record illustrates that Huggins knew on November 1, the day after the chancery court issued its bench ruling on October 31, that he might be subpoenaed by the AUSA to produce the DMR records in the Department of Audit's custody. Instead of contacting Patterson, Huggins called Attorney General Hood, who advised him to follow the instructions of the AUSA. On November 4, Huggins went to the federal courthouse, where he received a federal grand-jury subpoena, which mirrored the state grand-jury subpoenas, albeit without the added language contained in the state subpoenas requiring the DMR documents to remain in place and not be released to any entity other than the Department of Audit. The federal grand-jury subpoena instructed that Huggins deliver the DMR documents in the Department of Audit's possession in Biloxi to the federal courthouse in Jackson by 9:00 a.m.
 

 ¶ 52. Testimony from State Auditor Pickering at the December 4 and 6 hearings shows that all attorneys representing him and the Department of Audit were assigned by the Attorney General's office. According to Pickering, his assigned attorney, Patterson, had agreed to bring the DMR records to the courthouse as ordered by the chancery court. After the chancery court issued its October 31 ruling, Pickering told his staff "the Court has ruled these records are public and open and should be copied, and let's move forward to do so." When Pickering was informed that Huggins had been subpoenaed, he also was told there was a way to comply with both the order and the federal subpoena. Pickering testified that Huggins made the decision to transport the records to Jackson and he (Pickering) was not informed of the decision until after the documents had been delivered to Jackson. Huggins testified that he had been ordered by Pickering to make the DMR documents available to GP and had been instructed to honor the chancery court's order. Huggins also testified he was aware that Patterson had agreed to make the documents available to GP and to set up a procedure whereby an agent could be present to maintain the Department of Audit's chain of custody.
 

 ¶ 53. We agree with the chancery court that Huggins knowingly denied GP access to the public documents after the October 31 ruling. Accordingly, we find no abuse of discretion in the chancery court's decision to fine Huggins $100 under Section 25-61-15.
 

 ¶ 54. No record evidence was presented that Pickering, Lott, or Patterson participated in the wrongful denial of GP's record requests. Attorney General Hood and Special Assistant Attorneys General Runnels, Chestnut, and Pizzetta were neither noticed nor called to testify at the December hearings. Therefore, we must vacate that portion of the chancery court's judgment assessing each of them fines under MPRA.
 

 ¶ 55. Lastly, we speak briefly to the federal grand-jury subpoenas issued through the AUSA, by reiterating to all concerned what the United States Supreme Court has stated:
 

 We live in the jurisdiction of two sovereignties, [the state and federal governments] each having its own system of courts to declare and enforce its laws in common territory. It would be impossible for such courts to fulfill their respective functions without embarrassing conflict unless rules were adopted by them to avoid it. The people for whose benefit these two systems are maintained are deeply interested that each system shall be effective and unhindered in its vindication of its laws.
 
 The situation re
 

 quires, therefore, not only definite rules fixing the powers of the courts in cases of jurisdiction over the same persons and things in actual litigation, but also a spirit of reciprocal comity and mutual assistance to promote due and orderly procedure
 
 .
 

 Ponzi v. Fessenden
 
 ,
 
 258 U.S. 254
 
 ,
 
 42 S.Ct. 309
 
 ,
 
 66 L.Ed. 607
 
 (1922) (emphasis added). No person or thing "can[ ] be in two places at the same time[;]" thus:
 

 [t]he chief rule which preserves our two systems of courts from actual conflict of jurisdiction is that the court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other court shall attempt to take it for its purpose.
 

 Id.
 

 at 260
 
 ,
 
 42 S.Ct. 309
 
 .
 

 ¶ 56. In
 
 Covell v. Heyman
 
 ,
 
 111 U.S. 176
 
 ,
 
 4 S.Ct. 355
 
 ,
 
 28 L.Ed. 390
 
 (1884), the Court also explained:
 

 The forbearance which courts of co-ordinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity with perhaps no higher sanction than the utility which comes from concord; but between state courts and those of the United States, it is something more. It is a principle of right and of law, and therefore of necessity. It leaves nothing to discretion or mere conveni[e]nce. These courts do not belong to the same system, so far as their jurisdiction is concurrent; and although[ ] they co-exist in the same space, they are independent[,] and have no common superior. They exercise jurisdiction, it is true, within the same territory, but not in the same plane; and when one takes into its jurisdiction a specific thing, that res is as much withdrawn from the judicial power of the other as if it had been carried physically into a different territorial sovereignty. To attempt to seize it by a foreign process is futile and void.
 

 Id.
 

 at 182
 
 ,
 
 4 S.Ct. 355
 
 . Undoubtedly, much of this matter could have been avoided had this been regarded.
 

 CONCLUSION
 

 ¶ 57. For these reasons, we reverse and vacate that portion of the Court of Appeals' judgment holding that the records sought by GP in the Department of Audit's possession constituted investigative reports exempted by the MPRA. We reverse that portion of the Court of Appeals' judgment that reversed and rendered the chancery court's judgment against the Department of Audit for violation of the MPRA. We reverse that portion of the Court of Appeals' judgment finding that Huggins was not liable for the $100 penalty provision under Section 25-61-15. We affirm the chancery court's ruling that the Department of Audit is liable for $36,783.50 in attorney's fees and $1,249.95 in expenses. We reverse and render the chancery court's ruling that DMR is joint and severally liable for the same. We reverse and vacate that portion of the chancery court's judgment assessing, pursuant to the MPRA, a $100 fine to Pickering, Hood, Lott, Patterson, Runnels, Chestnut, and Pizzetta. This case is remanded for proceedings consistent with this opinion.
 

 ¶ 58.
 
 AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; RENDERED IN PART; AND REMANDED IN PART.
 

 WALLER, C.J., RANDOLPH, P.J., KING AND CHAMBERLIN, JJ., CONCUR. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION. KITCHENS, P.J., MAXWELL AND ISHEE, JJ., NOT PARTICIPATING.
 

 For purposes of this opinion, the Department of Audit refers collectively to the Mississippi Office of the State Auditor and the Mississippi State Auditor, Stacey Pickering, unless otherwise stated.
 

 Most of the facts and procedural history are taken from the Court of Appeals' opinion in
 
 Mississippi Department of Audit v. Gulf Publishing Co., Inc.
 
 ,
 
 235 So.3d 1452
 
 ,
 
 2016 WL 1212695
 
 (Miss. Ct. App. March 29, 2016).
 

 "1. All paperwork, documents and records of money transfers, payments, invoices, contracts, copies of checks, check stubs, an account of all money spent, including copies of leases, on boats leased by the DMR from the Mississippi Marine Resource Foundation or Marine Resource Foundation from 2006 to present. This should include records of expenditures by the DMR for repairs to the boats. 2. All documents related to expenditures and funding sources for the DMR account label 601. The funding source for the 601 account, all deposits; and all of DMR's New Sub-Grant Concurrence Worksheets that use the 601 account as a funding source. 3. All MOUs, MOAs, documents, paperwork and money exchanged between the DMR and the Institute for Marine Mammal Studies. 4. An expanded, complete explanation, including project work sheet and applications, for the Coastal Impact Assistance Program (CIAP) project listed on the Executive Summary Final Mississippi Coastal Impact Assistance Plan (Revised), 2007-2010 Plan Update 1 (through August 31, 2010), State of Mississippi. Mississippi Department of Marine Resources and Boards of Supervisors for Jackson, Hancock and Harrison counties as MS.R.747-New Beginnings for Marine Education USM GCRl $8,000,000."
 

 "[A]ccount receipts, expenditures & balances for Artificial Reef Program Account-for fiscal years ending June 30 of 2008, 2009, 2010, 2011, 2012."
 

 Runnels and Harold Pizzetta, both of the Attorney General's Office, presented the motion and proposed order to the circuit court.
 

 There were approximately three to four boxes of uncopied and unscanned originals scattered throughout approximately thirty-eight boxes and two filing cabinets-or sixty boxes total.
 

 According to the record, Patterson did not inform the chancellor that she (Patterson) was no longer "calling the shots" and had been replaced by Pizzetta from the Attorney General's Office.
 

 As the dissent points out, the protective order was submitted to the circuit court by DMR. But it was "[a]greed to" by Patterson, Special Assistant Attorney General assigned as counsel for the Department of Audit.
 

 Section 25-61-15 has since been amended and states as follows:
 

 Any person who shall deny to any person access to any public record which is not exempt from the provisions of this chapter or who charges an unreasonable fee for providing a public record may be liable civilly in his personal capacity in a sum not to exceed One Hundred Dollars ($100.00) per violation, plus all reasonable expenses incurred by such person bringing the proceeding.
 

 Miss. Code Ann. § 25-61-15
 
 (Supp. 2016).
 

 The dissent contends that Mississippi Office of the State Auditor, as a public body, cannot be held liable under Section 25-61-15 because the statute clearly states that only a person in his individual capacity can be held liable, not a public body. The chancery court's order finding that office liable under the MPRA was not challenged on that ground. Further, both this Court and the Court of Appeals have affirmed sanctions against public bodies under this section.
 
 See
 

 Mississippi Dep't of Wildlife, Fisheries and Parks v. Mississippi Wildlife Enforcement Officers' Ass'n, Inc.
 

 740 So.2d 925
 
 , 937 (Miss. 1999) (finding that the chancery court did not err in assessing penalties against the Department of Wildlife under Section 25-61-15 ); and
 
 Harrison County Dev. Comm'n v. Kinney
 
 ,
 
 920 So.2d 497
 
 , 503-04 (Miss. 2006) (finding same with penalties assessed under Section 25-61-15 against the Commission).
 

 We disagree with the dissent that the chancery court assessed the Department of Audit attorney's fees and expenses solely on the basis that it found the Department of Audit to be in contempt November 5 to December 5. Based on our reading of the chancery court's order, the chancery court held both the Department of Audit and DMR joint and severally liable for $36,783.50 in attorney's fees and $1,249.95 in expenses for violation of either the MPRA, and/or the MLAA, and/or for contempt of court. Further, even when a party purges itself of civil contempt, it still can be assessed attorney's fees and expenses for causing that contempt order to have been issued.